# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Agility Logistics Services Company KSC | ) | ASBCA Nos. 57415, 57416, 57417 |
| | ) | 57418, 57419, 57420 |
| | ) | 57421, 57422, 57423 |
| | ) | 57424, 57425, 57426 |
| | ) | 57895, 57896, 57897 |
| | ) | 57898, 57899, 57900 |
| | ) | 57901, 57902, 57903 |
| | ) | 57904, 57905, 57906 |
| | ) | 57907 |
| Under Contract No. DABV01-04-D-0014 | ) | |

APPEARANCES FOR THE APPELLANT: Michael R. Charness, Esq.
Graham E. Eddy, Esq.
Erin N. Rankin, Esq.
  Vinson & Elkins LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
Robert B. Neill, Esq.
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE DELMAN ON THE GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

The government has filed a motion to dismiss these appeals for lack of jurisdiction. Agility Logistics Services Company KSC (appellant or Agility) opposes the motion, and contends that the Board has jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, or under the ASBCA Charter.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. These appeals arise out of contracting officer (CO) decisions related to the definitization of task orders (TOs) issued under an Indefinite Delivery/Indefinite Quantity (ID/IQ) contract awarded to appellant[1] on 6 June 2004 by the Coalition Provisional Authority (CPA) of Iraq. The CPA was created by coalition nation partners to be the ruling authority in Iraq pending transfer of this authority to a newly constituted Iraqi

---

[1] The contract was awarded to appellant under the name "Public Warehousing Company, KSC" (amended compl. at 3 n.2).

government. *MAC International FZE*, ASBCA No. 56355, 10-2 BCA ¶ 34,591 at 170,507 (*MAC I*).

2. The contract scope of work was to establish and operate two distribution center warehouses and staging areas as part of a supply chain management system supporting the reconstitution of Iraqi security forces, and for the reconstruction support of Iraq civil infrastructure (R4, tab 1 at 5). The contract's Statement of Work (SOW) defined the period of performance as a one-year base period with two one-year options (*id.* at 6).

3. The contract stated "All task orders issued hereunder are subject to the terms and conditions of the basic contract. The basic contract shall take precedence in the event of a conflict with any task orders." (R4, tab 1 at 59)

4. The contract's SOW provided in paragraph 1.2 as follows:

> **1.2 Executive Agency.** The CPA is the current governing authority in Iraq. The U.S. Army is the executive agent for Program Management (PM) and contracting for CPA's Iraqi reconstitution and reconstruction programs. The Program Management Office [PMO] is a functional staff directorate of the Coalition Provision[al] Authority, reporting to the Administrator, CPA. The [PMO] is CPA's PM and contracting activity.

(R4, tab 1 at 5-6)

5. Paragraph 1.3 of the contract's SOW provided as follows:

> **1.3 Contract Management.** CPA's PMO contracting activity is the contracting activity responsible for the SCMSDP Support Contract. As the Contracting Activity for this contract, they have the authority, through a duly appointed Procuring Contracting Officer (PCO), to enter into, administer, and/or terminate this contract and make related determinations and findings.

(R4, tab 1 at 6)

6. At page 68 of the contract, there began a section entitled:

**CONTRACT PROCEDURES APPLICABLE TO VESTED AND SEIZED IRAQI PROPERTY AND DEVELOPMENT FUND FOR IRAQ [DFI]**

**This contract is entered into under the authority of the Administrator as head of the Coalition Provisional Authority**

2

**(CPA), which is temporarily exercising governmental authority in Iraq pursuant to the law and usages of war and relevant United Nations Security Council Resolutions including Resolution 1483 (2003) (Coalition)**

(R4, tab 1 at 68) Insofar as pertinent, this section contained the following contract provisions:

> **3. Assignment**. The Contractor shall not assign, transfer, or make any other disposition of this contract, or any part thereof, without the prior written consent of the Contracting Officer.
>
> **4. Changes**. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.
>
> **5. Disputes**. This contract is not subject to the Contract Disputes Act of 1978, as amended (41 U.S. Code, Sections 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal, or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the United States Federal Acquisition Regulation Clause 52.233-1, Disputes, which is incorporated herein by reference except that appeals from final decisions of a Contracting Officer may only be appealed to the U.S. Armed Services Board of Contract Appeals (ASBCA). The decision of the ASBCA shall be final. The contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.
>
> ....
>
> **29. Source of Funds**. *The obligation under this contract is made with Iraqi Funds, as defined in CPA Memorandum Number 4, dated 19 August 2003.*[2] *No funds, appropriated or*

---

[2] CPA Memorandum No. 4, the purpose of which was, *inter alia*, to establish procedures for contracts for the benefit of the Iraqi people using Iraqi funds, defines "Iraqi Funds" as including funds in the Development Fund for Iraq (gov't mot., ex. 4 at 1, 3).

3

*other, of any Coalition country are or will be obligated under this contract.* [Emphasis added][3]

....

**32. Turn Over of Coalition Provisional Authority.** The contractor hereby recognizes that a transfer of authority (TOA) from the [CPA] to the interim Iraqi Governing Council is scheduled to take place June 30, 2004. Furthermore, the contractor recognizes that upon the TOA on June 30, 2004, or upon any later TOA date if delayed, the CPA is dissolved. *The CPA, U.S. Government or Coalition Government will not be liable to the contractor for any performance undertaken after the TOA.* The contractor hereby waives any claims and rights it now has or may have in the future against the CPA, U.S. Government or Coalition Governments in connection with the contract. The interim Iraqi Governing Council may but is not obligated to be bound to the obligations of the CPA before the TOA with respect to performance undertaken after the TOA. The interim Iraqi Governing Council may but is not obligated to ratify all previous actions taken by the CPA and agree to be bound with the same force and effect as if the action had been undertaken [by] the interim Iraqi Government. If the interim Iraqi Governing Council undertakes any obligations under this contract, the CPA recognizes the interim Iraqi Government as its successor in interest with respect to any such obligations. All payments and reimbursements previously made by the CPA to the contractor and all other previous actions taken by the CPA under this contract shall be considered to have discharged those parts of the CPA's obligations under this contract. The contractor agrees that the CPA, the U.S. Government, or any Coalition Government is not obligated to pay or reimburse the contractor, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising from the TOA. Nothing herein shall be construed as a waiver of any rights the CPA, U.S. Government or a Coalition Government may have against the contractor.

(R4, tab 1 at 69, 72-73) (Emphasis added)

---

[3] Modification No. P00003, dated 4 December 2004, deleted ¶ **29, Source of Funds** (R4, tab 4), but this modification took effect about six months after the contract was awarded, and more than five months after the CPA was dissolved.

4

7. On 28 June 2004 the CPA issued CPA Order No. 100, which, *inter alia,* revised CPA laws, regulations, orders and memoranda to facilitate the transfer of authority to the new Iraqi Interim Government (IIG) (gov't mot., ex. 8, § 1 at 1). Insofar as pertinent, this order amended CPA Memorandum No. 4 above, rescinding the Disputes clause that provided for ASBCA jurisdiction over CPA contract disputes and provided, in its stead, for disputes resolution in accordance with the laws of Iraq (*id.* § 6 at 19, 20). This order was to be effective immediately prior to the transfer of authority from the CPA to the IIG (*id.* § 7 at 21). It is undisputed that on or about 28 June 2004, the CPA was dissolved, and sovereignty transferred from the CPA to the IIG. Pursuant to law, the IIG obtained control of the DFI at that time.[4]

Contract Administration

8. On 15 June 2004, the Minister of Finance of the IIG issued a Memorandum to the Director, PMO, referencing "SUBJECT: Administration of [DFI]–Funded Contracts." As of this date, the subject contract was funded with DFI funds (SOF ¶ 6, *see* clause ¶ 29). The Finance Minister, citing relevant CPA authority, provided the following delegation of authority for the administration of contracts on behalf of the IIG:

> I hereby designate you [PMO] with responsibility to monitor and confirm performance, certify and/or make payments and otherwise administer contracts or grants funded with monies from the [DFI] that:
>
> (a)    were entered into on or before June 30, 2004 by the Coalition Provisional Authority or the Multi-National Force–Iraq in accordance with United Nations Security Council Resolution 1483 and implementing regulations;
>
> (b)    require the continued performance and/or payment of money originating from the DFI past June 30, 2004; and
>
> (c)    are not the subject of a fully-funded letter of credit intended to otherwise ensure performance under the contract or grant.
>
> The [PMO] will provide as soon as practicable to the Ministry of Finance a breakdown by Ministry of contracts to which the PMO is a party.
>
> ....

---

[4] *See* CPA Regulation No. 11 (app. opp'n, ex. 3), and CPA Memorandum No. 15 (gov't mot., ex. 5), both signed by the CPA Administrator on 18 June 2004.

5

The powers, privileges, rights and authorities granted to you under this designation shall be exercised in coordination with relevant officials from the [IIG] and consistent with U.N. Security Council Resolution 1546 (2004), to satisfy outstanding obligations against the DFI. This designation does not authorize you to terminate, amend, or novate any contracts or grants covered by this designation. However, if requested by the IIG, you shall assist the IIG if it decides to terminate, amend or novate any such contract.

....

*The powers, privileges, rights, and authorities granted to you under this designation may be further delegated. They shall transfer to the Chief of Mission of the United States Embassy Baghdad and the Commander of the Multi-National Force-I on June 30, 2004, both of whom shall also have the authority to delegate these powers, privileges, rights, and activities further.* I retain the right to terminate this designation in writing at any time and for any reason whatsoever. You shall have the right to do the same. In any event, this designation shall expire on December 31, 2004 unless extended in writing by me or another duly authorized official of the [IIG].[5]

....

Nothing in this designation shall authorize the PMO, the MNF-I, and/or its designees to enter into any contracts funded by the DFI after June 30, 2004.

(Gov't mot., ex. 6) (Emphasis added)

9. We find that the IIG, as the new sovereign, assumed responsibility over the DFI-funded contracts for which it delegated contract administration above. We find that the subject contract, awarded 6 June 2004 and subject to DFI funds at the time of award, was one of those contracts.

10. Based upon the above IIG memorandum, we also find that the authority to administer these DFI-funded contracts, including the subject contract, was transferred from the PMO to the Chief of Mission of the United States Embassy Baghdad and the

---

[5] This designation/delegation of the IIG Finance Minister was extended through 31 December 2006 (gov't mot., ex. 7).

6

Commander of the Multi-National Force-I effective 30 June 2004. While earlier-issued TOs under this contract were funded by Iraqi funds and later-issued TOs were funded by U.S. appropriation (*infra*), there is no evidence showing that the IIG ever withdrew this delegation of authority with respect to this contract. Consistent with this IIG memorandum allowing for further delegation of contract administration authority, it appears that contract administration was exercised through various components of the Department of Defense (DoD) throughout the course of the contract (*see below*).

11. By National Security Presidential Directive dated 11 May 2004, the President established a temporary organization within the DoD called the Project and Contracting Office (PCO). The PCO was created, *inter alia*, to provide "acquisition and project management support to the Chief of Mission." (App. opp'n, ex. 5 at 3) The Deputy Secretary of Defense later ordered that the PCO be part of the Department of the Army (*id.*, ex. 6). The PCO was also identified in Block 6 of DD Form 1155 as the "issuer" under TOs 6 and 11 (SOF ¶ 15). Subsequently, the Joint Contracting Command/Iraq and Afghanistan (JCC-I/A) was established, whose responsibilities also included contract administration duties. *See Kellogg Brown & Root Services, Inc.*, ASBCA No. 56256, 10-2 BCA ¶ 34,613 at 170,591. The JCC-I/A was also identified in Block 6 of DD Form 1155 as the "issuer" on a number of TOs (SOF ¶ 15). It also appears that after performance of the TOs, the Army Contracting Command, Rock Island Contracting Center (ACC-RI) was involved with appellant's definitization proposals (SOF ¶ 16).

12. On 24 July 2004, the PCO issued an internal memorandum providing its understanding of its authority under the 15 June 2004 memorandum (SOF ¶ 8) from the IIG Finance Minister above. The memorandum stated as follows:

> In accordance with the Ministry of Finance's letter dated 15 June 2004, the Contracting Activity will continue to monitor and confirm performance, certify and/or make payments, and otherwise administer contracts or grants financed by Development Fund for Iraq (DFI) and awarded under the former Coalition Provisional Authority (CPA). *The delegation letter does not grant us the authority to award, terminate, amend, or novate any contracts or grants under that delegation.*

(App. opp'n, ex. 4) (Emphasis added) This memorandum reflects the PCO's understanding that it was acting on behalf of the IIG under these contracts, not on behalf of the United States.

The Relevant TOs

13. This contract was performed through the issuance of 20 TOs. Each of the 13 TOs at issue in these appeals was undefinitized at the time of award. (Amended Compl. ¶ 13)

7

14. The TOs were issued by use of DD Form 1155. The CPA was identified in Block 6 as "issuer" for TOs 1, 2, and 3. The CPA issued TOs 1 and 2 on 17 June 2004, both of which were funded by DFI, and neither of which is at issue in these appeals. The CPA also issued TO 3 on 19 June 2004. (App. opp'n, exs. 7, 8; R4, tab 87)

15. As for the other TOs, the PCO was identified in Block 6 as "issuer" under TOs 6 and 11 (R4, tabs 250, 454). The CPA was identified in Block 6 as "issuer" under TOs 9 and 10 (R4, tabs 345, 411). The JCC-I/A was identified in Block 6 as "issuer" under TOs 12, 14, 15, 16, 17, 18, 19, and 20 (R4, tabs 479, 499, 511, 528, 544, 562, 574, 594). Under a number of these TOs, the issuer granted performance time extensions.

16. Each TO remained undefinitized at the end of the performance period, and Agility submitted several rounds of definitization proposals to the government through March 2009 (amended compl. ¶ 141). At the request of ACC-RI in March 2009, the Defense Contract Audit Agency audited Agility's proposals and issued audit reports. The parties engaged in discussions to negotiate the definitization of the TOs. (*Id.* ¶¶ 145-52)

Claims and Appeals

17. On 23 September 2010, the CO issued 13 final decisions, unilaterally definitizing TOs 3, 6, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 20 (amended compl. ¶ 153) and claiming from appellant a total of $80,830,305.62 (*id.* ¶ 208). Each CO decision included the CDA language pertaining to a contractor's right to appeal.

18. On 5 November 2010, Agility timely filed notices of appeal to the Board, appealing twelve of the thirteen decisions, excluding the CO decision on TO 16 (Bd. corr., ASBCA Nos. 57415-57426). The Board assigned a docket number to each appealed decision, ASBCA Nos. 57415 through 57426.

19. On 19 April 2011, Agility submitted a certified claim to the CO in the amount of $47,196,205.98 plus interest, seeking unpaid costs and fees owed to Agility for its work under each of the 13 TOs (Bd. corr., ASBCA Nos. 57895-57907, amended NOA, 19 December 2011, ex. 1). The CO issued a final decision denying Agility's claim on 15 December 2011 (*id.*, ex. 2) This CO decision also included the CDA language pertaining to a contractor's right to appeal, and Agility timely filed a notice of appeal to the Board. The Board assigned a docket number to each of the 13 TOs, ASBCA Nos. 57895-57907.

20. On 8 July 2011, the government notified Agility that the government's monetary claim was "being loaded into the Treasury Offset Program for collection" (app. opp'n, ex. 13). By 14 September 2011, the Defense Finance and Accounting Service had set-off over $11 million in payments from an Agility contract with the U.S.

8

Government against the government's claims on the TOs (*id.*, ex. 14). By 21 September 2012, payments due to Agility had been offset by over $16 million (*id.*, ex. 15). As far as the record shows, there are no appeals before us with respect to these specific matters.

## DECISION

Our jurisdiction under the CDA is predicated upon a contract made by an "executive agency" of the United States as defined by the CDA, 41 U.S.C. §§ 7101(8), 7102(a). It is undisputed that this contract was awarded to appellant by the CPA. We have held that the CPA, created by a coalition of nation states, is not a federal executive agency for purposes of CDA jurisdiction. *MAC International FZE,* ASBCA No. 56355, 13 BCA ¶ 35,299 (*MAC II*); *MAC I,* 10-2 BCA ¶ 34,591.

Given our lack of CDA jurisdiction over a contract awarded by the CPA, appellant, as proponent of our statutory jurisdiction, must show that this contract was novated, transferred or assigned to a executive agency over which we have CDA jurisdiction. Appellant has not met this burden.

There is no evidence of record showing that the CPA or its successor IIG novated, transferred or assigned this CPA contract to the DoD or to any federal executive agency of the DoD. "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." RESTATEMENT (SECOND) OF CONTRACTS, § 280 (1981). Appellant contends that upon dissolution of the CPA, the U.S. Army or DoD became the new "obligor" under this contract and its TOs. However the "*Assent of the obligee of the original duty and of the obligor of the new duty is always necessary.*" *Id.*, cmt. c (emphasis added). There is no document in evidence showing that the purported obligor of this new duty, the Army/DoD, assented to assume the contract obligations of the CPA or its successor under this contract. To the contrary, the subject contract made clear that the United States had no intention of assuming any such contract obligations after the transfer of authority from the CPA: "The...U.S. Government...will not be liable to the contractor for any performance undertaken after the TOA" (SOF ¶ 6, clause 32).

The necessity for such evidence is particularly important because of the general immunity of the United States from suit. Whether the United States has waived this immunity and subjected itself to suit by assuming these contractual duties must not be lightly presumed.

Pursuant to the memorandum of the IIG Finance Minster above, the IIG delegated authority to administer this and similar contracts to the Chief of Mission of the U.S Embassy and the Commander of the Multi-National Force-I, effective 30 June 2004, which contract administration duties were later performed by various U.S. Army components (SOF ¶¶ 8, 9 10). Accordingly, the United States acted as a contract

9

administrator and not as a contracting party under these contracts. This fact was recognized by the PCO in its memorandum dated 24 July 2004 (SOF ¶ 12).

Appellant argues that the U.S. Army exceeded its authority as an agent for contract administration during performance of this contract and its aftermath. However assuming, *arguendo*, that appellant's contention is valid, a "rogue agent" does not a "principal" make. In the final analysis, no novation of this contract from the CPA or from the IIG to any DoD component has been shown.

We are not persuaded that the Army's execution of a TO, or the Army's "issuance" of a TO per Block 6 of the DD Form 1155, was tantamount to a novation, placing the U.S. Army in contract privity with appellant for purposes of CDA jurisdiction. We rejected a similar argument in *MAC II,* 13 BCA ¶ 35,299 at 173,277-78. Indeed, it is readily apparent that the name appearing in Block 6 had little, real significance. For example, the "CPA" was identified in Block 6 as issuer under TOs 9 and 10 (SOF ¶ 15), notwithstanding the CPA had been dissolved many months earlier.

Nor are we persuaded that the use of U.S. appropriated funds for a TO made for contract privity. We also rejected this argument in *MAC II,* 13 BCA ¶ 35,299 at 173,277-78:

> The contract under which the DOs now before us were issued was a contract between the CPA, an international entity, and MAC. The U.S. government was never a party to the contract nor to any of the DOs. The U.S. government's role in the contracting process (through the CPA Contracting Activity, PCO and JCC-I/A) was solely as the specific delegate of the CPA until its dissolution on 28 June 2004 and, after the dissolution of the CPA, by specific delegation by the IIG. MAC argues that the 16 DOs now at issue were U.S. government contracts and that, after dissolution of the CPA, they were obligations of the U.S. government and did not transfer to the IIG. However, the DOs issued under the CPA contract, to which the U.S. government was never a party, obligated the same contracting party as the contract itself: the CPA and, by virtue of CPA Order Number 100, any successor entities such as the IIG....
>
> ....
>
> [T]he existence of our jurisdiction is not changed by the fact that the 16 DOs at issue in the remainder of the appeal contained U.S. government appropriated fund cites. [Citations omitted]

10

Appellant cites *AmerescoSolutions, Inc.*, ASBCA Nos. 56824, 56867, 11-1 BCA ¶ 34,705 *(Ameresco)*, for the proposition that the Board has CDA jurisdiction over a TO issued by a DoD component under an ID/IQ contract. We believe the facts of *Ameresco* are distinguishable.

In *Ameresco*, the ID/IQ contract provided for various federal agencies, including DoD components, to enter into delivery orders with the contractor to obtain energy savings services. On the other hand, this CPA contract, awarded with Iraqi funds, did not provide for DoD components to enter into any delivery orders with the contractor to obtain any services (SOF ¶ 13). Also, this CPA contract provided that the basic contract shall take precedence in the event of conflict with the TOs; in *Ameresco* it was the delivery orders that were granted precedence.

We believe that neither *Ameresco* nor any of the other cases cited by appellant compels a conclusion supporting our jurisdiction under the CDA under the circumstances presented here. We conclude that we lack jurisdiction over this CPA contract and its TOs under the CDA.

## The ASBCA Charter

The ASBCA was created by the DoD by Charter. Part 1, paragraph 1 of the Charter, provides as follows:

> 1. There is created the Armed Services Board of Contract Appeals which is hereby designated as the authorized representative of the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy and the Secretary of the Air Force, in hearing, considering and determining appeals by contractors from decisions of contracting officers or their authorized representatives or other authorities on disputed questions. These appeals may be taken (a) pursuant to the Contract Disputes Act of 1978 (41 U.S.C. Section 7101-7109), (b) pursuant to the provisions of contracts requiring the decision by the Secretary of Defense or by a Secretary of a Military Department or their duly authorized representative, or (c) pursuant to the provisions of any directive whereby the Secretary of Defense or the Secretary of a Military Department or their authorized representative has granted a right of appeal not contained in the contract on any matter consistent with the contract appeals procedure. The Board may determine contract disputes for other departments and agencies by agreement as permitted by law. The Board shall operate under general policies established or approved by the Under Secretary of Defense for Acquisition, Technology and Logistics and may perform other

11

> duties as directed not inconsistent with the Contract Disputes Act
> of 1978.

48 C.F.R., Ch. 2, Appx. A, Part 1 (2007).

Appellant contends, alternatively, that we have jurisdiction over these appeals under the ASBCA Charter, pursuant to the Disputes provision of the CPA contract requiring decision of disputes by the ASBCA (SOF ¶ 6). We disagree. Consistent with CPA Order No. 100 and its amendment of CPA Memorandum No. 4 (SOF ¶ 7), we believe that the CPA intended to eliminate ASBCA jurisdiction over contract disputes effective on the date of transfer of authority to the IIG. Appellant argues that this change applied to new or prospective contracts only, but this contention is not supported by the record.

However, even if CPA Order No. 100 did not have the effect of removing the original Disputes clause from this contract, it is nevertheless clear that parties to a contract may not by agreement confer jurisdiction on a tribunal where jurisdiction otherwise does not exist. There is nothing in our DoD Charter that confers jurisdiction on this Board over disputes under this contract with the CPA. The Board did not have any agreement with the CPA or with the nation states that created it to hear CPA contract appeals, nor has appellant shown any DoD directive that would otherwise grant jurisdiction to the Board over such appeals. Nor has appellant shown that the CPA was a DoD organization or that any DoD contract was involved here. We rejected similar arguments in *MAC I*, 10-2 BCA ¶ 34,591 at 170,518-19.

The cases cited by appellant in its opposition papers are distinguishable. They involve our jurisdiction over appeals under contracts between contractors and DoD non-appropriated fund instrumentalities under which the parties consented to our jurisdiction. These facts do not pertain here.

In view of the foregoing, we conclude that we do not have jurisdiction of these appeals under the ASBCA Charter.

"Implied-In-Fact" Contract to Definitize TOs

Alternatively, appellant contends that there exists an "implied-in-fact" contract between Agility and ACC-RI to definitize the TOs over which we may exercise jurisdiction under the CDA (app. opp'n at 24-25), citing the conduct of the parties in the negotiation of the definitization of the TOs. This "implied-in-fact" contract claim is not identified in appellant's claim letter dated 19 April 2011, and raises separate and distinct facts from those supporting appellant's claim of privity through, among other things, the execution, issuance and the funding of the TOs. As a prerequisite to our jurisdiction, a contractor claim must be presented first to the CO for decision, 41 U.S.C. § 7103(a)(1). Accordingly, we are without jurisdiction over this "implied-in-fact" contract claim.

12

Assuming, *arguendo*, that this "implied-in-fact" contract claim was somehow indirectly raised in appellant's claim letter of 19 April 2011, we are still without jurisdiction for the following reason. Appellant's claim posits an implied-in-fact agreement by the government to provide definitization services. It is well settled however that the CDA does not extend to contracts that provide government services *to* a contractor; rather, the CDA extends to the government's procurement of services *from* a contractor. *Laudes Corp. v. United States*, 86 Fed. Cl. 152, 161 (2009). Appellant has failed to show such a procurement here. Appellant also has not persuaded us that our DoD Charter provides for our jurisdiction over any "implied-in-fact" contracts of this nature.

For reasons stated, we are without jurisdiction over appellant's "implied-in-fact" contract claim.

Appellant's Request for Stay

Alternatively, appellant requests an indefinite stay to allow it to take additional discovery on the jurisdictional issue.

When the government raised the jurisdictional issue by letter to the Board dated 3 July 2013, citing *MAC II*, appellant responded by letter dated 9 July 2013. Appellant did not seek a stay for additional discovery at that time. Rather, it argued forcefully against the government's position on jurisdiction, distinguishing *MAC II,* and provided evidence in support. Not only did appellant fail to seek a stay, it requested "that the Board expedite review of the jurisdiction issue, so that the parties can continue [settlement] negotiations, and enter into a Mediation Agreement." (Bd. corr., ASBCA Nos. 57415-57426)

On 25 July 2013, the Board convened a conference to set a briefing schedule on the jurisdictional issue, and issued an Order on Briefing dated 29 July 2013. Again, appellant did not object to setting a firm briefing schedule, nor did it seek a stay of the proceedings for additional discovery.

On both of the above occasions, appellant did not assert that it needed additional discovery to assert or defend its position. Appellant's comprehensive treatment of jurisdiction in its motion papers also belies its current position.

We believe that appellant's request in its motion papers for an indefinite stay of proceedings for additional discovery is untimely and unreasonable. We deny appellant's request.

13

<u>Appellant's Request for Substantive Board Orders</u>

Alternatively, appellant requests that if we determine we are without jurisdiction, the Board should issue orders to the government to withdraw its claims and pay appellant all withheld funds. Appellant's request is self-contradictory. A tribunal without jurisdiction of an action may not issue any substantive orders to the parties with respect to matters related to the action. Once we determine we are without jurisdiction, we must dismiss the appeals. *See Johns-Manville Corp. v. United States*, 893 F.2d 324, 327 (Fed. Cir. 1989).

CONCLUSION

For reasons stated herein, we lack jurisdiction over these appeals. The government's motion to dismiss is granted, and the appeals are dismissed.

Dated: 9 December 2014

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57415, 57416, 57417, 57418, 57419, 57420, 57421, 57422, 57423, 57424, 57425, 57426, 57895, 57896, 57897, 57898, 57899, 57900, 57901, 57902, 57903, 57904, 57905, 57906, 57907, Appeals of Agility Logistics Services Company KSC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals